UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| PHYLLIS EISENSTOCK and MARC EISENSTOCK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-12023-DJC |
| | ) | |
| TALCOTT RESOLUTION LIFE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM AND ORDER

CASPER, J.                                                                    June 5, 2023

I.      Introduction

Plaintiffs Phyllis Eisenstock ("Phyllis") and Marc Eisenstock ("Marc") (collectively, "Plaintiffs") have filed this lawsuit against Talcott Resolution Life, Inc. ("Talcott") relating to a life insurance policy issued by Talcott to Plaintiffs' parents. D. 1. Specifically, Plaintiffs asserts four claims for a declaratory judgment (Count I), breach of contract (Count II), negligence (Count III), and violations of Mass. Gen. L. c. 176D, § 3 and Mass. Gen. L. c. 93A, § 2 (Count IV). Id. Talcott has now moved for judgment on the pleadings. D. 19. For the foregoing reasons, the Court ALLOWS Talcott's motion for judgment on the pleadings as to Count I for a declaratory judgment, Count III for negligence,[1] and Count IV for violations of Mass. Gen. L. c. 176D, § 3 and Mass. Gen. L. c. 93A, § 2, but DENIES the motion as to Count II for breach of contract. Id.

---

[1] At the motion hearing, Plaintiffs withdrew Count III, the negligence claim.

1

## II.     Standard of Review

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A Rule 12(c) motion for judgment on the pleadings is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion.  Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006) (citing cases).  To survive a motion for judgment on the pleadings, therefore, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court "view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom" in their favor.  Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (citation and internal quotation marks omitted).

On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings, including the answer.  See Aponte-Torres, 445 F.3d at 54–55.  In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice."  R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006) (citation omitted).

## III.     Factual Background

Unless otherwise indicated, the following summary is based upon the facts as alleged in the complaint.  D. 1.

Talcott, through its predecessor Hartford Life Insurance Company, originally issued life insurance policies to Plaintiffs' parents, Mildred ("Mildred") and James ("James") Eisenstock, in 1993.  Id. ¶ 8; see D. 20-1 at 2.  Phyllis, and later Marc, were named as policyowners and

beneficiaries.  Id.  The policies had a scheduled maturity date of February 12, 2030.  Id.  In 2000, Talcott replaced these policies with a Flexible Premium Variable Life insurance policy (the "Policy"), which reflected the same terms and maturity date as the former policies.  Id. ¶ 9.  James passed away in 2012.  Id. ¶ 10.  From 2000 to November 2018, Talcott mailed annual statements to Phyllis' home address in Boynton Beach, Florida.  Id. ¶ 11.  In August 2019, Phyllis relocated to Framingham, Massachusetts.  Id. ¶ 12.  The complaint does not allege that she notified Talcott of her change of address and Plaintiffs do not suggest same in their opposition.

On December 12, 2019, Talcott sent a Grace Period Notice to Phyllis' former address in Florida, stating that the Policy was in danger of terminating unless a premium in the amount of $5,627.35 was received by February 13, 2020.  D. 1 ¶ 13; D. 1-1 at 2.  Talcott sent a Final Grace Period Notice to Phyllis at her former Florida address on January 13, 2020.  D. 1 ¶ 14; D. 1-1 at 4. Finally, on February 13, 2020, Talcott sent Phyllis a Policy Termination Notice to that address.  D. 1 ¶ 14; D. 1-1 at 6.  Because Phyllis had moved to Massachusetts, she did not receive any of these notices.  D. 1 ¶ 15.

The Policy Termination Notice stated that "[f]ortunately, you have a valuable reinstatement feature that is available for the next five years, which may enable you to reinstate your coverage." Id. ¶ 14; D. 1-1 at 6.  This reinstatement feature in the Policy provides:

> Unless the Policy has been surrendered for its Cash Surrender Value, the Policy may be reinstated prior to the Scheduled Maturity Date provided:
>> (a) the Insureds alive at the end of the Policy Grace Period are also alive on the date of reinstatement;
>> (b) You make Your request in Writing within five years from the Termination Date;
>> (c) satisfactory evidence of insurability is submitted;
>> (d) any Indebtedness at the time of termination must be repaid or carried over to the reinstated policy; and
>> (e) You pay sufficient premium to:
>>> (i) cover all Monthly Deduction Amounts that are due and unpaid during the Policy Grace Period; and

(ii) keep the Policy in force for 3 months after the date of reinstatement.

D. 1 ¶ 16; D. 20-1 at 18.  In October 2020, Phyllis requested a Reinstatement Application after learning that the Policy had been terminated, which Talcott then mailed to her former Florida address.  D. 1 ¶ 17.  On October 29, 2020, Talcott sent her a second letter at her address in Massachusetts, noting that "[r]ecently we sent the enclosed correspondence to you, but it was returned by the U.S. Postal Service" and that it had "conducted an address search and located this address for you and have updated our records accordingly." Id. ¶ 18; D. 1-1 at 8.  Phyllis submitted the Reinstatement Application to Talcott in December 2020.  D. 1 ¶ 19; D. 20-5.

By letter dated February 1, 2021, Talcott informed Phyllis that it was "unable to approve this application and must decline your request for reinstatement due to [Mildred's] medical history obtained from Shrewsbury Primary Care.  To reinstate a lapsed policy, you must qualify for the same PREFERRED underwriting risk class as the policy that was originally issued.  Changes in health, the diagnosis of a new condition, or the practice of new activities can change a person's risk classification for insurance purposes."  D. 1 ¶ 20; D. 1-1 at 10.  After receiving a request from Phyllis for more information regarding the denial, Talcott further noted in a March 15, 2021 letter that "[f]or a policy to be considered for reinstatement, an insured must fall into the same rate class as when the policy was originally issued. . . . Upon review of the request for reinstatement, it was determined that [Mildred] was not eligible for reinstatement at the same rate class in which she was originally approved."  D. 1 ¶ 21; D. 1-1 at 13.  That letter also reiterated that "[t]his was a result of the medical history obtained from Shrewsbury Primary Care" and "[d]ue to personal information provided in [Mildred]'s medical record received, we are unable to provide you with the information from her physician.  The information relating to the denial of the reinstatement request has been sent directly to [Mildred]."  D. 1-1 at 13–14.  This separate letter, also dated

March 15, 2021, stated that "[t]he medical records received from Dr. Jerrianne Seger indicate a history of memory loss and cognitive decline starting in 2018 and as recently as May 2020."  D. 20-8 at 2.[2]

## IV.   Procedural History

On November 28, 2022, Plaintiffs initiated this lawsuit.  D. 1.  After Talcott filed its answer to the complaint, D. 8, it filed a motion for judgment on the pleadings, D. 19.

## V.   Discussion

### A.   Breach of Contract (Count II)

To state a breach of contract claim, a plaintiff must plausibly allege "(1) the existence of a valid contract; (2) that it has performed its obligations under the contract; and (3) a breach of the contract that causes damages."  Lombard Med. Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432, 438 (D. Mass. 2010) (citing Persson v. Scotia Prince Cruises, Ltd., 330 F.3d 28, 34 (1st Cir. 2003)).  In Count II, Plaintiffs allege Talcott breached the Policy by refusing to approve their Reinstatement Application, in violation of the Policy's reinstatement provision.  D. 1 ¶¶ 19–23, 27–31; D. 28 at 4–8.  According to Plaintiffs, the Reinstatement Application satisfied the conditions precedent for reinstatement of the Policy.  See D. 1 ¶ 19, 29; D. 28 at 6.

Talcott argues that, because the Policy lapsed due to the nonpayment of premiums, no enforceable contract exists unless Plaintiffs satisfied the conditions precedent to reinstatement.  D. 20 at 9–11.  Talcott further argues that Plaintiffs specifically did not meet the condition precedent

_____

[2] Plaintiffs suggest that this Court cannot consider this additional March 15, 2021 letter, which Talcott attached to its motion, because it was not referenced in their complaint as either an allegation or exhibit.  D. 28 at 3 n.2.  The Court, however, can consider "documents central to plaintiffs' claim."  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (citing cases).  As the complaint makes plain, Plaintiffs' claims turn on Talcott's denial of the Reinstatement Application, to which this second March 15, 2021 letter also is central.

for reinstatement of submitting "satisfactory evidence of insurability."[3]  Id. at 10.  Viewing this

record in the light most favorable to Plaintiffs, however, the Court cannot conclusively determine

whether "satisfactory evidence of insurability [was] submitted" such that Talcott did not breach

the Policy by failing to reinstate same.

Here, the complaint and attached documentation do not allege or necessarily reveal any

changes in Mildred's health, diagnosis of a new condition, or a practice of new activities, which

Talcott indicated might affect her insurability, a condition precedent to reinstatement.  D. 1 ¶ 20;

D. 1-1 at 10.  Indeed, the complaint alleges that Plaintiffs submitted the Reinstatement Application

and "are and were ready, willing, and able to perform their obligations under the Policy."  D. 1 ¶¶

19, 29.  Furthermore, the Reinstatement Application asked the following question, to which

Mildred responded "no":

> To the best of your knowledge and belief, do you have any reason to believe that
> you are not currently in good health?  Good health is defined as a state in which
> there appears to be no current or pending need for the services of a member of the
> medical profession for reasons other than for conditions such as a common cold or
> an annual physical exam.

D. 20-5 at 9.  Accordingly, in the Reinstatement Application, Plaintiffs and Mildred "declare[d]"

that Mildred was in good health, and that that answer was "complete and true to the best of [their]

knowledge and belief."  Id. at 9, 13.  This answer was consistent with most of their responses in

---

[3] In a footnote, Talcott seems to suggest further that Plaintiffs failed to satisfy another condition precedent:  the "payment of premiums."  D. 20 at 11 n.5.  Talcott argues that Plaintiffs never offered, and it never accepted, any payment of premiums.  Id.  The complaint, however, alleges that, upon learning of the Policy's lapse, Phyllis asked Talcott for a Reinstatement Application and, in its correspondence to her, it did not indicate that the premiums needed to be paid at that time, or prior to the approval of the application.  D. 1 ¶¶ 17–18; D. 1-1 at 8.  The Reinstatement Application itself explicitly envisions scenarios in which premiums are paid after the submission of the application.  D. 20-5 at 13 (stating that "[i]n the event we receive premium after the date this Application is signed . . .").  Furthermore, the complaint specifically alleges that Plaintiffs "were ready, willing, and able to perform their obligations under the Policy."  D. 1 ¶ 29.

the Reinstatement Application, indicating that Mildred had not been treated or had not had treatment recommended for a wide variety of health conditions.  Id. at 8–9.

Likewise, at this juncture, Talcott has not provided sufficient evidence as to any changes in Mildred's health, diagnosis of a new condition, or a practice of new activities.  In its briefing, it argues that Mildred admitted in her Reinstatement Application to "a medical history of 'Alzheimer's disease or dementia.'"  D. 20 at 10.  The Reinstatement Application, however, did not do so; instead, it asked the following question, to which Mildred responded "yes":

> Have you ever been treated for, or had treatment recommended by a member of the medical profession for: . . . Dizziness; fainting or loss of consciousness; Alzheimer's disease or dementia; epilepsy or seizure disorder; brain or spinal cord disorder; other nervous system disease; depression; anxiety; stress or panic attacks; or other psychological disease, condition or disorder?

D. 20-5 at 8–9.  This question is sufficiently broad, such that in responding "yes," Mildred was not necessarily admitting to a medical history of Alzheimer's disease or dementia.  Talcott did inform Mildred that it denied her application because "[t]he medical records received from Dr. Jerrianne Seger indicate a history of memory loss and cognitive decline starting in 2018 and as recently as May 2020," D. 20-8 at 2, but there has been no discovery yet as to the basis for same.

Furthermore, to the extent Talcott argues that it had ultimate discretion to withhold approval of the Reinstatement Application, D. 20 at 11, caselaw suggests that discretion must be discharged in good faith and approval cannot be withheld arbitrarily or capriciously, see, e.g., West v. Lincoln Benefit Life Co., 509 F.3d 160, 166 (3d Cir. 2007) (explaining that "[t]he insurer cannot be arbitrary or capricious in considering the evidence of insurability provided in an application for reinstatement" (citation and internal quotation marks omitted)); Wiener v. AXA Equitable Life Ins. Co., No. 16 Civ. 04019 (ER), 2021 WL 1226925, at *19 (S.D.N.Y. Mar. 31, 2021) (explaining that "an agreement to reinstate an insurance policy upon satisfactory evidence of insurability does

not bestow on the insurer absolute discretion to disapprove an application for reinstatement; so long as an applicant's insurability would be satisfactory to a reasonable insurer, and all back premiums have been paid, reinstatement cannot be denied" (citing cases)); Eur. Pension Mgmt. Ltd. v. Columbus Life Ins. Co., No. 1:16-cv-542, 2017 WL 4540233, at *15 (S.D. Ohio Oct. 11, 2017) (explaining that "[t]he phrase 'satisfactory to [the insurer]' is interpreted using an objective standard such that the evidence must be satisfactory to a reasonable insurer" (citation omitted)). As noted previously, there is insufficient evidence in the record for the Court to conclusively determine whether Talcott was entitled to deny the Reinstatement Application.

Ultimately, if Plaintiffs satisfied the conditions precedent to reinstatement, Talcott's obligations under the Policy should have resumed and it breached same by failing to do so, which caused Plaintiffs damages—thereby plausibly alleging the elements of a breach of contract claim. See, e.g., Shurdut v. John Hancock Mut. Life Ins. Co., 320 Mass. 728, 731 (1947) (explaining that "[t]he reinstatement of the policy was expressly made conditional upon the truth of the statements made in the application for reinstatement" and "[t]hat condition was a condition precedent to the resumption of obligation on the part of the defendant); Kukuruza v. John Hancock Mut. Life Ins. Co., 276 Mass. 146, 149 (1931) (explaining that "[t]he continuance of the defendant's obligation under the policy, . . . according to its terms, was conditional upon the payment of premiums as provided therein" (citation omitted)); see Mass. Gen. L. c. 175, § 132 (11) (requiring life insurance contracts to "contain[] in substance the following: . . . [a] provision that the holder of a policy shall be entitled to have the policy reinstated at any time within three years from the date of default, . . . upon the production of evidence of insurability satisfactory to the company and the payment of all overdue premiums and any other indebtedness to the company upon said policy, . . .").  As to Count I, therefore, judgment on the pleadings in favor of Talcott is not warranted.

B.     **Declaratory Judgment (Count I)**

In Count I, Plaintiffs seek a declaratory judgment stating that (1) they "included satisfactory evidence of insurability, within the meaning of the Policy's reinstatement provision;" (2) Talcott's "refusal to reinstate the Policy because Mildred Eisenstock allegedly 'was not eligible for reinstatement at the same rate class in which she was originally approved' was improper and unsupported by the Policy's plain terms;" and (3) Talcott "is required to reinstate the Policy" pursuant to "the plain terms of the Policy."  D. 1 ¶ 26.  Judgment on the pleadings in favor of Talcott is warranted as to Count II because the requested declaratory judgment would be duplicative of Plaintiffs' breach of contract claim, Count I.

Plaintiff's breach of contract claim alleges that "Phyllis submitted the Reinstatement Application to Defendant, along with all of the requested medical information for her mother, Mildred, which constituted satisfactory evidence of insurability within the meaning of the Policy's reinstatement provision," "[t]he Policy is a valid and binding contract between Plaintiffs and Defendant," "Plaintiffs are and were ready, willing, and able to perform their obligations under the Policy," and "Defendant breached the Policy [by refusing to reinstate same]."  Id. ¶¶ 19, 28–30.  If the Court declared that Plaintiff's Reinstatement Application included satisfactory evidence of insurability, that Talcott's refusal to reinstate "was improper . . . [under] the Policy," and that Talcott was required to reinstate the Policy, the declaration would necessarily resolve the breach of contract claim, as discussed above.  Plaintiffs concede as much in their brief, where they state that "the declaration Plaintiffs seek pertains to the parties' respective rights and obligations pursuant to [the reinstatement] provision."  D. 28 at 9.  The claims are, therefore, duplicative and judgment on the pleadings is warranted.  See, e.g., Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013) (citations omitted) (instructing that "[p]leading an additional cause of

action [which] provides . . . no further remedy . . . is . . . subject to dismissal as a duplicative claim" and dismissing claim for declaratory relief where it "merely duplicates Count I, which also asserts a cause of action for breach of [contract]" (citing cases)); Sterry St. Auto Sales, Inc. v. Cummins Inc., No. 20-cv-10798-MPK, 2020 WL 6871022, at *3–4 (D. Mass. Nov. 23, 2020) (dismissing claim requesting declaratory judgment as duplicative of breach of contract claim); BASF Corp. v. Martineaus Auto Body, Inc., No. 18-cv-10881-ADB, 2019 WL 383885, at *5 (D. Mass. Jan. 30, 2019) (same); Gormally Broadcasting Licenses, LLC v. Charter Commc'n Holding Co., LLC, No. 16-30152-MGM, 2017 WL 3131986, at *6 (D. Mass. Feb. 28, 2017) (same); Torres v. Tommie Copper, Inc., No. 15-cv-13007-GAO, 2016 WL 8902576, at *4 (D. Mass. Aug. 26, 2016) (same).

## C.    Chapter 93A (Count IV)

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. L. c. 93A, § 2(a).  To sustain such a claim, the plaintiff must plausibly allege that (1) the defendant committed an unfair or deceptive act or practice; (2) the unfair or deceptive act or practice occurred in the conduct of any trade or commerce; (3) the plaintiff was injured; and (4) the defendant's unfair or deceptive act or conduct was the cause of the injury. Rafferty v. Merck & Co., Inc., 479 Mass. 141, 161 (2018) (citations omitted).  In Count IV, Plaintiffs allege Talcott's failure to reinstate the Policy amounted to a Chapter 93A violation.  D. 1 ¶¶ 36–42.

While Chapter 93A does not define what constitutes an "unfair or deceptive" practice, courts have defined "an act or practice [as] unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive, or unscrupulous'; and 'causes substantial injury to consumers.'"  Walsh v. TelTech Sys., 821 F.3d 155, 160 (1st Cir. 2016) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366

Mass. 593, 596 (1975)).  "[A]n act or practice is deceptive 'if it possesses a tendency to deceive'
and 'if it could reasonably be found to have caused a person to act differently from the way he [or
she] otherwise would have acted.'"  Id. (second alteration in original) (quoting Aspinall v. Philip
Morris Cos., Inc., 442 Mass. 381, 394 (2004)).  While these definitions do not provide a "precise
test for determining whether conduct is unfair or deceptive," Tomasella v. Nestlé USA Inc., 364
F. Supp. 3d 26, 32 (D. Mass. 2019), caselaw makes clear that a simple breach of contract and mere
negligence do not give rise to a Chapter 93A claim, see, e.g., Anoush Cab, Inc. v. Uber Techs.,
Inc., 8 F.4th 1, 18 (1st Cir. 2021) (explaining that the caselaw "do[es] not diverge from the Chapter
93A principle that something more [than a breach of contract or negligence] and rising to the level
of extreme or egregious conduct is required for a successful Chapter 93A claim" (citation
omitted)); Incase Inc. v. Timex Corp., 488 F.3d 46, 56 (1st Cir. 2007) (explaining that "[s]imple
breach of contract is not sufficiently unfair or deceptive to be alone a violation of Chapter 93A"
(citation omitted)).

    "[T]o transform a breach of contract to a Chapter 93A claim, the breach must be both
knowing and intended to secure unbargained-for benefits to the detriment of the other party. . . .
[T]he theme of the cases in which a breach of contract has amounted to a 93A violation is the use
of a breach of contract as a lever to obtain advantage for the party committing the breach in relation
to other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor
of unfairness."  Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd., No. 14-cv-12047-
ADB, 2015 WL 4467064, at *9 (D. Mass. July 20, 2015) (internal citations and quotation marks
omitted).  Here, the complaint is devoid of any factual allegations that would give Plaintiffs'
garden-variety breach of contract claim "an extortionate quality" or "rancid flavor of unfairness."
To be sure, the allegations specifically referring to the Chapter 93A claim are merely conclusory

statements with no factual support.  See, e.g., D. 1 ¶ 38 (alleging that "Defendant's actions

constitute unfair and deceptive practices in violation of G. L. c. 176D, § 3[4] and G. L. c. 93A, § 2");

id. ¶ 39 (alleging that "Defendant's misconduct was willful and/or knowing").   At bottom,

Plaintiffs' complaint alleges Talcott breached the Policy by failing to reinstate same, but "contains

no sufficiently pled allegations regarding any additional services or advantages [Talcott] sought to

obtain" and "no allegations that [Talcott] strung out the process . . . .  [Plaintiffs'] well-pled facts

suggest nothing more than a mere breach of contract, even if it is a knowing or intentional breach."

Whitman & Co., Inc., 2015 WL 4467064, at *9.[5]  Without any such allegations, Plaintiffs' Chapter

93A necessarily fails.

Plaintiffs' only retort is that the underlying facts are still in dispute, and so their Chapter

93A claim is not amenable to judgment on the pleadings because, in their view, whether Talcott's

refusal to reinstate the Policy was unfair is a question of fact.  D. 28 at 11.  As an initial matter,

"[a] ruling that conduct violates [Chapter] 93A is a legal, not a factual, determination.  . . .

Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question

of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a

question of law."  Incase Inc., 488 F.3d at 56–57 (second and third alterations in original) (internal

---

[4] In the insurance context, "[a] violation of [C]hapter 176D may form the predicate for a cause of action under section 9 of [C]hapter 93A."  Cont'l Ins. Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir. 2000) (citing Transamerica Ins. Grp. v. Turner Constr. Co., 33 Mass. App. Ct. 446, 452 (1992)).  Plaintiffs, however, have not made any argument as to Chapter 176D, see generally D. 28, so to the extent their Chapter 93A claim is based upon a violation of Chapter 176D, that claim fails.

[5] To the extent that the c. 93A claim is based upon negligence, it also fails as the negligence claim, Count III, has been withdrawn.  Even if it had not been withdrawn, "a [C]hapter 93A violation can be based in negligence *only* when the negligence 'is paired with an unfair or deceptive act or practice.'"  Foisy v. Royal Maccabees Life Ins. Co., 241 F. Supp. 2d 65, 70 (D. Mass. 2002) (quoting Damon v. Sun Co., 87 F.3d 1467, 1484 n.10 (1st Cir. 1996)) (italics in original).  As explained above, Plaintiffs make no allegations in this regard from which the Court could even infer an unfair or deceptive act on Talcott's part.

citations and quotation marks omitted); <u>see, e.g., Bearce v. Morton Hosp.</u>, No. 22-cv-10708-DJC,
2022 WL 17823768, at *6 (D. Mass. Dec. 20, 2022) (dismissing c. 93A claim on a Rule 12(b)(6)
motion).  Furthermore, at this stage in the proceedings, it is Plaintiffs' burden to allege sufficient
facts plausibly to state a Chapter 93A claim—a burden which they have not shouldered.

Judgment on the pleadings as to Count IV, therefore, is warranted.

## VI.     Conclusion

For these reasons, the Court ALLOWS Talcott's motion for judgment on the pleadings as
to Count I for a declaratory judgment, Count III for negligence, and Count IV for violations of
Mass. Gen. L. c. 176D, § 3 and Mass. Gen. L. c. 93A, § 2, and DENIES the motion as to Count II
for breach of contract.  D. 19.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge